UNITED STATES BANKRUPTCY COURT                    **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
AT CENTRAL ISLIP
-----------------------------------------------------------x
In re:

WHITNEY LANE HOLDINGS, LLC,                        Chapter 11

                                                   Case No. 08-72076-478
                                      Debtor.
-----------------------------------------------------------x


### MEMORANDUM DECISION


*Appearances:*


Silverman Acampora LLP
*Attorneys for the Debtor*
By:  Anthony Acampora, Esq. & Gerard Luckman, Esq.
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753


Duane Morris LLP
*Attorneys for OSJ of Clifton Park LLC*
By: Gerard Catalanello, Esq.
1540 Broadway
New York, NY 10036


The Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

**Background**

On April 25, 2008 Whitney Lane Holdings, LLC, (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code (the "Code"), and continues to operate its business as a debtor-in-possession.  One of the Debtor's primary assets is a piece of commercial real property located at 1208 Route 146, Clifton Park, New York known as North Country Commons ("North Country Commons" or the "Property").  The Debtor purchased the Property in 2004 for $4.55 million.  Neither the transcripts nor the appraisals provided to the Court paint a clear picture as to the vacancy rate or the tenant mix of North Country Commons when it was purchased by the Debtor in 2004.

OSJ of Clifton Park, LLC ("OSJ") is a secured creditor pursuant to an assignment of a note, mortgage and related loan documents (collectively, the "Loan Documents") evidencing a mortgage on North Country Commons.[1]  OSJ purchased the Loan Documents for the sum of $3,650,000.00 in 2007.  On August 20, 2008 OSJ filed a secured claim in the Debtor's bankruptcy case in the amount of $4,333,431.31, plus post-petition interest, costs and fees (the "Claim").

The Debtor filed a plan and disclosure statement on July 23, 2008, and a hearing on their approval was held on September 11, 2008.  The Court approved the disclosure statement, with the instructions to the Debtor to amend it with changes that were stated at the hearing. Thereafter, on October 7, 2008 the Debtor filed an Amended Chapter 11 plan and disclosure statement, and an Order was entered on October 10, 2008 approving the Amended Disclosure Statement.  On January 9, 2009 OSJ filed opposition to the confirmation of the Debtor's Plan. The key component of the Debtor's Plan and Disclosure Statement is the valuation of North

---

[1] OSJ received its assignment on or about June 22, 2007 from DLL Family Limited Partnership which had commenced a mortgage foreclosure action against North Country Commons on or about December 13, 2006.

2

Country Commons.  OSJ and the Debtor dispute the value of the Property, and an evidentiary hearing was scheduled by the Court to determine the Property's value.

The Court has jurisdiction over the parties and subject matter over this contested matter pursuant to 28 U.S.C. §§ 157 (a), (b)(1), (b)(2)(A), and 28 U.S.C. § 1334(b).

A.  *North Country Commons*

Located about ten to twelve miles north of Albany, North Country Commons is an improved, one story neighborhood shopping center that was built in 1975 and was renovated in 1995.  It contains approximately 118,600 gross leaseable square feet located on 15.75 acres.  It is located in the Albany-Schenectady-Troy MSA[2] situated in eastern-central New York.  It is located in Saratoga County, which both appraisals noted has seen one of the largest increases in population in the area over the past several years. (Ex. 1 at 16-17; Ex. 3 at 7).  The biggest employer in this region is the State of New York as a large segment of the population works in the public sector. (Ex. 1 at 19; Ex. 3 at 7).

North Country Commons is approximately 45% occupied by four (4) tenants consisting of (a) Dollar General, a discount item store for low/middle income shoppers, (b) Northern Lights, a nightclub, (c) the Northway Fellowship Church, and (d) Pioneer Bank.  Testimony was adduced during the hearings that a fifth tenant, JX3 Exerfit, a gymnasium, had signed a lease and had taken possession of the space, but had not yet begun to pay rent.  There is no anchor tenant. While the Property is in need of some deferred maintenance, both appraisers agreed that the costs for these repairs were not prohibitively expensive. (Tr. 1/13 at 27-32; Tr. 1/22 at 120).[3]

---

[2] A metropolitan statistical area ("MSA") is defined by the United States Office of Management and Budget and results from the application of published standards from the Census Bureau. (Tr. 1/22 at 86.)

[3] ("T" or Transcript references refer to the hearings held on January 13, 2009, January 22, 2009 and March 9, 2009.)

B. *The Evidentiary Hearing*

The Court held an evidentiary hearing regarding the "as is" value of the Property over a span of three days: January 13, 2009, January 22, 2009 and March 9, 2009.  At the evidentiary hearings appraisers from both sides were called as witnesses and testified as to their respective appraisals.  The Debtor's appraiser was Dennis Ryan, MAI ("Ryan" or "Debtor's Appraiser") and OSJ's appraiser was Jonathan R. Peatfield, MAI ("Peatfield" or "OSJ's Appraiser").  Ryan had previously appraised the Debtor's Property in 2007 in connection with potential mortgage financing on the Property.[4]  Peatfield testified that he had assessed the property three times, including the instant appraisal for OSJ.[5] (Tr. 1/22 at 7-8 & 122).  Both parties stipulated that Ryan[6] and Peatfield[7] were qualified as experts to provide opinions regarding the valuation of North Country Commons and the Court accepted their qualifications and testimony.

Ryan and Peatfield utilized the same methodologies in determining the value of the property, but they reached very different results.  Ryan's concluded that the "as is" value of North Country Commons is approximately $5.6 million dollars, while Peatfield concluded that the "as is" value of the Property is approximately $2.6 million dollars.  After reviewing the transcripts of the hearings and the admitted evidence and appraisals, the Court makes a

---

[4] ,Ryan's 2007 Appraisal was entered into evidence as Ex. 2.  Ryan's 2007 Appraisal valued the Property at $7.8 million "as is" and projected that it would be fully occupied by February 2009.  It is undisputed that as of February 2009 the Debtor is not fully occupied, and that Ryan's conclusions in the 2007 Appraisal were incorrect.  The Court notes that OSJ makes much of the fact that a 2007 appraisal conducted by Ryan had valued the property at $7.8 million, and posited that the property would have been fully occupied by February 2009 despite the fact that the property remains approximately 50% vacant today.  While the earlier appraisal does color the more recent appraisal conducted by Ryan, it does not rise to the level of disproving Ryan's 2008 appraisal.  As the Court has noted, Ryan's 2008 appraisal is supported by his methods and the comparables that he utilized (as well as the adjustments that he made).

[5] Peatfield's earlier appraisals were not submitted to the Court.

[6] Ryan has been a real estate appraiser for 28 years. Ryan is currently employed by Metropolitan Value Services in Manhattan, where he is Senior Vice-President.

[7] Peatfield has been a real estate appraiser for 27 years.  He is currently employed by Peatfield Consulting, LLC, and is the sole proprietor.

determination that the "as is" value of North Country Commons is $5.5 million dollars.  OSJ is oversecured.

**Discussion**

As has been noted by numerous courts, the valuation of assets is not an exact science, and is done on a case-by-case basis.  *See e.g., Karakas v. Bank of N.Y.* (*In re Karakas*), 2007 Bankr. LEXIS 1578, 16-17 (Bankr. N.D.N.Y. May 3, 2007); *In re CGE Shattuck*, 2000 Bankr. Lexis 1783, *3 (Bankr. D. N.H. 2000) (noting that "the question of valuing property in the context of a Chapter 11 case is a fact-sensitive one); *In re Melgar Enter., Inc.*, 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993).  When evaluating real property, appraisers are called upon to use their judgment in determining the steps of the appraisal and the best statistics and facts to utilize.  It is the role of the Court to sift through the appraisals and testimony and make a judgment as to the "accuracy and credibility" of the appraisers.  *See* In *re Miami Beach Hotel Investors LLC*, 304 B.R. 532, 535 n.4 (Bankr. S.D. Fla. 2004).

Both appraisers utilized the same methodologies: the "income capitalization approach" and the "sales comparison approach.[8]  However, despite the commonality in their methods, their conclusions as to value diverged dramatically by approximately $3 million.

**A.  <u>The Best Use of the Property</u>**

There is no dispute that the "highest and best use" of the Property is as a neighborhood shopping center. (Ex. 1 at 63-64; Ex. 3 at 18-19).[9]  Both appraisals cite to *The Dictionary of Real Estate Appraisal,* which defines "highest and best use" as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." (Ex. 1, at 64; Ex. 3 at 18).

---

[8] Neither of the appraisers used the "cost approach" due to the age of North Country Commons.
[9] All exhibits referred to in this memorandum decision are exhibits that were submitted to the Court by both parties at the Evidentiary Hearing and were admitted into evidence at that hearing.

A land valuation conducted by an appraiser examines the value of the property as if it was unencumbered by any building improvements, and helps the appraiser determine what the "best use" of the property would be. However, of the two appraisals, only Ryan's contains a land valuation, which details how he came to his conclusion.

In order to ascertain the land value, Ryan reviewed five comparable land sales, four of which were in Clifton Park, and spoke with the owners of those properties. He looked at the properties for conditions of sale, shape/topography, size, and location, and made adjustments to make them resemble North Country Commons as much as possible. (Tr. 1/13 at 50-52). After adjusting for market conditions, Ryan concluded that the range was $115,489 to $338,542 per acre, with a median value per acre of $184,471.00. (Ex. 1 at 68). He concluded that value per acre of the subject Property would fall in the median range due to its condition, occupancy, and age. As the Property is 15.75 acres, Ryan concluded that the land value for North Country Commons was approximately $2.9 million dollars as if it was vacant and unencumbered by any existing building improvements. (Ex. 1 at 68-69). Thus, he testified that the Property still had vitality and viability if the vacant spaces could be rented. (Tr. 1/13 at 53). Since the land value alone is appraised at $2.9 million dollars, the property with rentable built space must have a greater value than the value placed on the entire property by OSJ.

Conversely, Peatfield's Appraisal report did not contain a land valuation. However, he did testify that he conducted one and that he believed the land value was $2,040,000.00. (Tr. 1/22 at 79). He testified that he used comparable land sales for properties that were "greatly smaller" than North Country Commons, but that he did make adjustments for zoning, location and size. (Tr. 1/22 at 79). It is peculiar that Peatfield concluded that the land value was $2,040,000.00 because he ultimately concludes that the "as is" value of the Property as a whole

6

is $2.6 million.  OSJ argues that the Court should not consider the land valuation of the Property provided by Ryan as both Ryan and Peatfield concluded that the "highest and best use" of the Property is as a shopping center. (OSJ's Findings of Fact at 25).  The Court believes that it would be counter-productive to ignore the value of the land that the shopping center is located on, as it would be unable to divorce its land value from the value of the actual shopping center buildings and tenants.  In addition it is clear that should an investor seek to increase its usable rentable additional space, it does have the vacant land upon which it could build additional rental spaces.

Peatfield's ultimate value conclusion is only a $560,000 increase in value over his land value, despite the fact that the buildings on the premises are fully erected and are approximately 50% leased.  This stands in stark contrast to Ryan's valuation of $2.9 million.  According to Ryan, the land value of the Property alone is worth more than Peatfield's valuation of the entire Property.  Thus, the Court finds that Ryan's land valuation is more persuasive, and also concludes that the best use of the land is as a shopping center.

### B.  Income Capitalization Approach

The theory behind the "income capitalization approach" is that the value of the property is the present worth of future benefits to an investor. (Ex. 1 at 72; Ex. 3 at 21-22).  There are two methodologies utilized: (1) direct capitalization, and (2) discounted cash flow.  "Under either method, future net operating income ("NOI") is forecasted and then capitalized at a rate of return ("cap rate") that will be sufficient to attract investors."  *In re Hotel Assocs., LLC,* 340 B.R. 554, 557 (Bankr. D.S.C. 2006); *see In re Southmark Storage Assocs. Ltd. P'ship*, 130 B.R. 9, 11 (Bankr. D. Conn. 1991).  The difference between the two methods is the time period that the projection is made over: "the direct capitalization method covers a short period of time (a

"snapshot") whereas the [discounted cash flow] method covers a longer period of time." *In re Vienna Park Properties*, 132 B.R. 517, 520 (Bankr. S.D.N.Y. 1991).

  a.  *Discounted Cash Flow*

    i.  The Holding Period

The discounted cash flow analysis entails the forecasting of income and expenses over a period of time, and then discounts the net income into present value.  (Ex. 3 at 32; Ex. 1 at 72); *see In re Southmark Storage Assoc. Ltd. Partnership*, 130 B.R. 9, 10 (Bankr. D. Conn. 1991 ("There are three steps in the discounted cash flow analysis: (1) the net operating income is estimated for each year of a projection or holding period; (2) a reversion, i.e., a selling price at the end of the holding period, is estimated; and (3) the net operating income for each year of the holding period and the reversion are discounted to present value.").  It "assumes the sale of a property to a buyer who holds it for a period of years, typically ten years, and then sells it." *In re Prussia Associates,* 322 B.R. 572, 580 (E.D. Pa. 2005); (Tr. 1/22 at 41).  According to Korpacz Real Estate Investor's Survey ("Korpacz"),[10] the typical holding period for strip centers is ten years, which was supported by testimony from both appraisers. (Tr. 1/13 at 60 & 63; Tr. 1/22 at 41).  However, neither appraiser used a ten year holding period in their analysis.

Ryan, the Debtor's Appraiser, utilized a 12 year holding period.  The additional two years were added by Ryan because, in his opinion, based on the present economy, the Property would not be leased and stabilized for at least two more years and thus he incorporated those two underperforming years with the traditional ten year period. (Ex. 1 at 73; Tr. 1/13 at 60 & 156).  Conversely, Peatfield, OSJ's Appraiser, used a five year holding period.  Peatfield's rationale

---

[10] Both Ryan and Peatfield testified that Korpacz provides real estate appraisers with real data from actual investors concerning real estate markets throughout the United States. (Tr. 1/13 at 35-36; Tr. 1/22 at 103)  It is published four times a year and provides national indicators rates of returns, capitalization rates, and methodologies.  (Tr. 1/13 at 35-36; Tr. 1/22 at 103)

was that (1) the Property does not have an anchor tenant; (2) the existing subject leases and forecast lease terms were five years with five year renewal options; and (3) the property was not an institutional grade investment worthy of a ten-year holding period. He also concluded that the Property would not be stabilized for another six years. (Ex. 3 at 32). As such, he believed the five year period was more appropriate. However, the Court is not persuaded by Peatfield's reasoning.

As has been acknowledged by both appraisers, the typical holding period for similar properties is ten years. Ryan, utilizing the standards listed in Korpacz, increased the holding period by two years because he incorporated the two potentially underperforming years into his appraisal and he felt it would take longer for the Property to be fully leased. However, Peatfield just cut the traditional holding period in half based on the existing lease terms and the lack of an anchor tenant. Utilizing a five year holding period as compared to the traditional ten year holding period automatically reduces the value of North Country Commons regardless of when it would be stabilized. This dramatically highlights the difference in valuation between the two appraisals and helps to explain the $3 million chasm between them. Peatfield even acknowledged at the January 22 Hearing that had he used a ten-year holding period, everything else in his appraisal being equal, the value of the Property would increase to $3,113,000. (Tr. 1/22 at 109).[11]

Peatfield's own appraisal posits that the cash flow for North Country Commons will drastically increase in 2011 through 2014, which is within the five year period that he says the

---

[11] The valuation utilizing the ten-year holding period does not appear in Peatfield's appraisal report. (Tr. 1/22 at 109).

Property owner will keep it. (Ex. 3 at 36-1).[12]    But as his projections kept increasing with each subsequent year, it is unclear why the Property owner would sell the property in 2014 prior to maximizing the economic benefits that could be derived from the Property over a longer period of time.    Thus, the Court concludes that the ten year holding period applied by Ryan is more persuasive.

ii.    Market Rent

The next discrepancy between the parties is the potential market rent of the property to be utilized in calculating the net operating income.    The gross leasable area of the Debtor is between 118,616 square feet and 118,609 square feet.[13]    In Ryan's Appraisal he analyzed the current tenant rentals at the Property, and conducted a market rent analysis to determine potential gross income based upon the spaces at the Property (anchor space, junior anchor, inline space, and outparcel space). (Ex. 1 at 72-93; Tr. 1/13 at 66-67).    Ryan obtained the projected market rent by analyzing twenty-one comparable market rents, twenty of which were located in the same MSA as North Country Commons, and five of which were located in Clifton Park. (Ex. 1 at 50-62; Tr. 1/13 at 64).    He made adjustments to these properties to bring them in line with North Country Commons. (Ex. 1 at 51-54).    Ryan concluded that the base rent for the anchor space would be $6.00, $9.00 for the junior anchor space, $10.00 for the inline tenant space, and $21.00 for the outparcels. (Ex. 1 at 54).

Peatfield concluded that the Debtor could lease the vacant space for between $5.00 and $6.50 per square foot "as is" and for $10.00 stabilized. (Ex. 3 at 29).    In reaching this conclusion,

---

[12] The Court notes that some pages of the Peatfield appraisal are not numbered.    As a result, for purposes of clarity, when referencing these pages the Court will assign them the number of the preceding page, followed by a dash and then a notation of what subsequent non-numbered page the Court is referring to.

[13] The Court is unclear as to how the appraisals show a discrepancy between the two of them of 7 square feet. (Ex. 1 at 50; Ex. 3 at 22).    One possible explanation can be found in OSJ's appraisal, which states that it excluded the mezzanine areas from the gross leasable square feet. (Ex. 3 at *v*).

Peatfield looked at four rent comparables, three of which did not have an anchor tenant. (Ex. 3 at 25-28). This is significant in his analysis because the subject Property does not have an anchor tenant. However, he admitted on cross-examination that none of the properties were located in Clifton Park, but within five to six miles of the Property, and they were substantially smaller than North Country Commons in terms of total gross lease area. (Tr. 1/22 at 88 and 90). The location and the size of the properties analyzed were likely a factor in the potential market rent that could be charged for them. Furthermore, on cross-examination, Peatfield admitted that he did not have all of the tenant rental information on his First Comparable, and relied solely on an asking price for rentals on his Third Comparable, as he had no actual tenant information. (Tr. 1/22 at 91-92).

The Court does want to acknowledge that Peatfield, and not Ryan, considers the presence of a restrictive covenant in the "Dollar General" lease which prohibits the Debtor from renting space at the Property to any other discount, variety or general merchandise stores. (Ex. 3 at 23). Thus, Peatfield concludes that the presence of the covenant substantially harms the Debtor's ability to draw in tenants, and he implies that this will negatively impact the potential market rent that could be charged. (Tr. 1/22 at 35-36). However, while Peatfield made conclusions that the covenant would harm the market rents, his appraisal does not provide support for his conclusion. In fact, in his First Comparable there is a Dollar General tenant, but no analysis is provided as to whether that Dollar General lease has the same restrictive covenant as the one located at the Property, and if it does, how it impacted the market rents of the First Comparable. (Ex. 3 at 25). Such information would have been helpful to the Court and may have provided support for Peatfield's overall appraisal.

OSJ argues that Ryan's calculation that an inline tenant would pay $10 is incorrect in light of the proposed lease to JX3 ExerFit which seeks to charge them $6 per square foot. (Tr.

1/13 at 134-135).  At the January 13 Hearing Ryan stated, in response to questioning of this nature, that the JX3 Exerfit lease is for four years and that by 2013 an anchor tenant will be in place and the value of the leased space will increase.  As a result, the rent paid by JX3 Exerfit would then have to increase or it would have to leave. (Tr. 1/13 at 135).  Thus, as the JX3 Exerfit was "not impacting the rest of the shopping center" negatively, the lease rent was appropriate in order to fill space for the short-term. (Tr. 1/13 at 135).  The Court finds this rationale persuasive.

After reviewing both appraisals and the transcripts, and considering the arguments raised, the Court concludes that Ryan's appraisal regarding the market rents is more persuasive, and thus, the Court adopts Ryan's market rents.

### iii.  Net Operating Income and Discount Rate

The other discrepancies between Ryan's and Peatfield's analyses are the net operating income and discount rate to apply to the calculations.  Ryan determined the gross income stream and forecasted to see what would happen to market rents as the time went on.  As Ryan utilized a twelve year holding period due to his conclusions that the Property will not be stabilized until the end of year two.  Ryan determined that the net operating income in Year 3, the first stabilized year, would be $619,543.00.[14] (Ex. 1 at 80).

In order to complete his analysis, Ryan hypothetically sells the Property at the end of the twelve year holding period and applied a discount rate of 10.50% in order to determine the "as is" value of the Property.  Ryan applied the discount rate of 10.50%, which was consistent with Korpacz, due to the location of the property, the nature of the local economy, the age and condition of the property, and the occupancy and rent levels. (Ex. 1 at 82 & 86).  After his

---

[14] Relying on his assumption that the Property would not begin to be profitable until the third year, Ryan calculated that the effective gross income would be $997,313.00, and the total operating expenses would be $377,770.00. Thus, Ryan determined that the net operating income of the Debtor was $619,543.00.

calculations, Ryan concluded that the "as is" value of the Property is $5.6 million. (Ex. 1 at 87-88; Tr. 1/13 at 64, 74 & 78).

Peatfield's analysis disputes Ryan's calculations of the estimated NOI of $619,543.00. As pointed out by OSJ, the Property has never had an NOI as high as that before, and that such a calculation represents "wishful thinking." (OSJ Findings of Fact at 12-13). Peatfield assumes that in the sixth year, which is when he projects that the property will be stabilized, the net operating income will be $421,028. (Ex. 3 at 37-38). He then uses a discount rate of 11.50% plus a 1.85% tax rate[15] (for a total of 12.35%). Peatfield selected the 11.50% discount rate by relying on the Korpacz 2nd Quarter 2008 Report, which had noted an average discount rate of 10.13%, and adjusted the discount rate upwards based on factors that he deemed pertinent, such as the location of the Property, the lack of an anchor tenant, and its limited highway exposure. (Ex. 3 at 35). His calculations bear out that the Property has an "as is" value of $2.6 million.[16] (Ex. 3 at 37-38).

In accordance with the Court's earlier determinations regarding the holding period and market rent to be applied to the Property, both of which impact the final steps of the discounted cash flow analysis, the Court concludes that Ryan's discounted cash flow valuation of the Property of $5.6 million is more persuasive.

### b. Direct Capitalization

The second methodology in the income capitalization approach is direct capitalization analysis. Direct capitalization analyzes a single year's income expectancy at a projected

---

[15] Ryan's appraisal does not show that he added a tax basic discount rate to his discount rate. The tax rate applied by Peatfield appears to be in response to his conclusion that the Property is over-assessed. (Tr. 1/22 at 118).

[16] The Court notes that during the direct examination of Peatfield he admitted that his Appraisal on page 37 contained an error as to the final valuation of North Country Commons. (Tr. 1/22 at 53-54). Page 37 has the value as being $2,360,784, but on the record he testified that it is $2,586,340. Counsel for OSJ cites the rounded version of $2.6 million in his Findings of Fact.

stabilized income level, and then determines the present value of the property by using an overall capitalization rate to convert it into value. (Ex. 1 at 81); *see In re Hotel Assocs., LLC*, 340 B.R. 554, 557 n.4 (Bankr. D.S.C. 2006). The purpose is to produce a rate that "reflects the combination of mortgage and equity funds required for purchase and the proportion of the total value represented by each." (Ex. 3 at 31).

Utilizing the direct capitalization method Ryan concluded that North Country Commons has a $5.5 million dollar value "as is," and $7.3 million dollar value "as stabilized." (Ex. 1 at 84; Tr. 1/13 at 77-85). To arrive at these numbers Ryan looked at actual market transactions in the local market place to see what an investor would pay for the property as stabilized. (Ex. 1 at 82 & 100). Ryan ascertained what the appropriate capitalization rate by analyzing five properties in the North Country Commons MSA and consulted with Korpacz. (Ex. 1 at 100; Tr. 1/13 at 79-85). The range of overall capitalization rates ranged from 6.70% to 8.60%, although the average rate in the Albany market was approximately 6.40%.[17] However, acknowledging that the subject Property lacked an anchor tenant, was older than the comparables, and had a lower vacancy rate, Ryan increased the capitalization rate to 8.5%. (Ex. 1 at 83-84; Tr. 1/13 at 79-85). Ryan then took the net operating income in the first stabilized year, Year 3, which was noted to be $619,543.00 and divides it by the capitalization rate, which results in a stabilized value of $7.28 million. (Ex. 1 at 84). In order to determine the "as is" value, Ryan then deducted two years of rent loss, leasing commissions, and tenant allowances for an "as is" value of $5.5 million. (Ex. 1 at 84).

Peatfield disputes Ryan's capitalization rate, and applies a capitalization rate of 10.5%. He focused on the 2nd Quarter 2008 Korpacz Report, which showed rates for non-institutional

---

[17] Ryan also looked at another source to assist in determining the capitalization rate called *Real Capital* Analytics, which tracks sales in the Albany market. (Ex. 1 at 82).

investment grade retail properties to be between 7% and 13%, for an average of 10.13%, and that the range for terminal capitalization rates were between 6% and 10%. (Ex. 3 at 31).  Peatfield went beyond the terminal capitalization range and concluded that due to the condition, age, vacancy rate and tenant mix of the Property, a 10.5% terminal capitalization rate was more appropriate. (Tr. 1/22 at 45 & 108).  As noted above, he also determined to use a discount rate of 11.50% plus a 1.85% tax rate (for a total of 12.35%). (Ex. 3 at 37-38).  Thus applying the $402,976.00 projected stabilized net operating income in Year 6, Peatfield divided it by his 10.5% capitalization rate and arrives at $3.87 million stabilized value. (Tr. 1/22 at 49).  Peatfield then deducts 6% for resale to reflect costs for a broker to market the property for a total of $3.8 million as stabilized.  He then applies his discount rate, and arrives at a present value of $2.6 million "as is."  Both Ryan's and Peatfield's conclusions were consistent with their conclusions under the discounted cash flow method.

### C.  Sales Comparison Analysis

Both Ryan and Peatfield utilized the sales comparison analysis in order to verify their findings under the income capitalization approach.  Under the sales comparison approach the appraiser conducts a search of a similar real estate market to the subject property in order to find properties in similar situations to determine the value of the property in question.  However, as each real property is unique the appraiser will make adjustments to account for the differences between the subject property and the comparable properties in order to determine the appropriate value of the subject property.  *See In re Maple*, 2008 Bankr. LEXIS 2562, 6-7 (Bankr. D. Vt. Aug. 8, 2008); *In re Hotel Assocs., LLC,* 340 B.R. 554, 561 (Bankr. D.S.C. 2006); *In re SM 104 Ltd.,* 160 B.R. 202, 212 (Bankr. S.D. Fla. 1993).

As noted, North Country Commons is located in the Albany-Schenectady-Troy MSA. OSJ's counsel is correct in his assertion that an appraiser is not required to utilize statistics from the MSA where the appraised property is located.  However, the Court finds that statistics pulled from the same MSA are more persuasive when considering the valuation of property than those from other geographic areas and MSAs.  As each piece of land is unique, statistics from the same area would most likely yield a clearer picture of what the subject property might be worth.

   a.  *Ryan's Comparables*

Ryan chose four sales and one sales listing for his sales comparison approach. All of the sales have taken place since November 2006, one of which was sold within a month of his valuation date. (Ex. 1 at 100; Tr. 1/13 at 86-96).  All of them are located in the same MSA as North Country Commons.   Ryan adjusted his comparables for size, marketing conditions, location and condition.

Ryan's First Comparable has 56,180 gross leasable square feet, and is located in a smaller neighborhood area with an anchor tenant and a 95% occupancy level. (Ex. 1 at 98 & 100).  It was sold for $5.58 million, and its tenant mix and net operating income were superior.  Thus, Ryan made downward adjustments of 40% to reflect its differences from North Country Commons. The Second and Third Comparable is the same property; it was a sale and resale. (Tr. 1/13 at 159).  It is located in Saratoga Springs, NY, and has a gross leasable square feet of 178,391, a 100% occupancy rate, and its anchor mix and condition are superior to North Country Commons. (Ex. 1 at 98).  Ryan made adjustments of 60% to reflect these differences.

The Fourth Comparable is located in Columbia East Greenbush, N.Y., a similarly situated town as Clifton Park, with a gross leasable space of 132,648, which is larger than North Country Commons.  (Ex. 1 at 100).  The property is 78% occupied, but it has an anchor tenant and the net

16

operating income is higher than that of the Property. (Ex. 1 at 99).    Thus, Ryan made a downward adjustment on the value of the property of 40%.  The Fifth Comparable, located in Colonie, N.Y., has an anchor tenant, is 92% occupied, and has a higher net operating income.  It has a similar physical size to the Property with 139,616 gross leasable square feet.  Thus, Ryan made a 30% downward adjustment. (Ex. 1 at 99).

Ryan's ranges as to the price per square foot, as adjusted for his comparable sales, were between $34.89 per square foot and $60.61 per square foot. (Ex. 1 at 100; Tr. 1/13 at 86-96).   In his opinion North Country Commons did not fall into either the low or high range, and thus he determined that comparable sales to North Country Commons were approximately $48 per square foot.  Utilizing these numbers, Ryan concluded that under the sales comparison approach, the "as is" value of North Country Commons is $5.7 million. (Ex. 1 at 102; Tr. 1/13 at 86-96). This result is consistent with his conclusions under the income capitalization approach. However, it is not clear whether there is support for his conclusion that $48 per square foot is appropriate or whether the square foot value should be less.

OSJ correctly points out that the comparables used by Ryan all have anchor tenants, and all have occupancy rates higher than the Property, which range from 78% to 100%.  Upon review of Ryan's Appraisal it is clear to the Court that he factored in these differences and acknowledged the infirmities of North Country Commons in comparison to these properties by making downward adjustments of 30% to 60% of the comparable used in order to for them to be considered comparable with the subject Property.  The Court acknowledges that the adjustments that Ryan made were "qualitative" and not part of any set formula.[18]  The Court is also aware that appraisal work is subjective.  *See Buckland v. Household Realty Corp.* (*In re Buckland*), 123

---

[18] (Tr. 1/13 at 168-169).

B.R. 573, 578 (Bankr. S.D. Ohio 1991) (noting that valuation is "ultimately the opinion of a particular appraiser").

### b. Peatfield's Comparables

Unlike Ryan, Peatfield used three comparables in his sales comparison approach. The three comparables chosen by Peatfield were non-anchored shopping centers. The reason that he focused on non-anchored shopping centers is because North Country Commons does not currently have an anchor tenant. All three of the properties sold for between $1.35 and $2.6 million.[19]

Peatfield's First Comparable is located in Columbia County, New York, which is not in the same MSA as the Property[20] and is in superior physical condition as compared to the Property. (Tr. 1/22 at 55). It sold for $2.6 million in 2008 and was built in 1995. However, it is substantially smaller than North Country Commons with a 47,780 square footage. (Ex. 3 at 40).[21] At the January 22 Hearing Peatfield testified that there was an error in his report, which reflects that there was a 75% vacancy at the property, and in fact that property was only 35% vacant. (Tr. 1/22 at 97). Regardless of the vacancy, Peatfield testified that he made no adjustments to the value to account for the actual vacancy. (Tr. 1/22 at 96).

Peatfield's Second and Third Comparable are located in Saratoga County, which is in the same MSA as North Country Commons. Peatfield's Second Comparable sold for $1.35 million

---

[19] The Debtor's contends that the Peatfield appraisal should be viewed skeptically because OSJ has purchased two of the comparable properties. The Court is not persuaded by this assertion as no evidence was put forth to justify such a determination.

[20] Peatfield testified at the January 22 Hearing that the First Comparable was not located in the same MSA as North Country Commons. He did testify that "Columbia County, by all persons that live in our MSA, is considered a portion of our MSA. The Census Bureau, you know, has its distinct boundaries for population and demographics, however, the people that live in MSA's don't necessarily abide by those boundaries." (Tr. 1/22 at 55). Regardless of what a lay person believes to be an MSA, the Census Bureau clearly states what county is or is not located in a particular MSA.

[21] At the January 22 Hearing there was some question as to whether or not the Peatfield's First and Second Comparable were sold as part of a distressed sale. (Tr. 1/22 at 93-96). Coincidentally, both were sold to OSJ. (Tr. 1/22 at 92 and 96).

in 2006.  Similar to Peatfield's First Comparable it is much smaller than the Property as it has 40,020 square feet, which is about a third of the size of the Property. (Ex. 2 at 41; Tr. 1/22 at 97). Peatfield testified that the Second Comparable was entirely vacant, and similarly to the First Comparable he did not make any adjustments to the value to reflect this vacancy. (Tr. 1/22 at 96).  Peatfield's Third Comparable was 80% vacant at the time of sale for $2 million in 2004. (Ex. 3 at 42).  Like the other two comparables used by Peatfield, it is also smaller than North Country Commons with 65,450 square footage, which is approximately half the size of the subject Property. (Ex. 3 at 42; Tr. 1/22 at 101).  Like the other two properties, Peatfield made no adjustments for the occupancy of the property. (Tr. 1/22 at 101).  Peatfield concluded that under the sales comparison approach the "as is" value of the Property is $2.6 million. (Ex. 3 at 43).

When considering the comparables utilized by both Ryan and Peatfield in their analysis the real factor for the Court is the adjustments made.  Since there can be no two properties that are exactly alike, it is necessary for an appraiser to acknowledge the differences between the comparable properties and the subject property in order to clearly show the Court why their comparables should be given more weight than the opposing side's appraiser.

OSJ makes much of the fact that Ryan made subjective adjustments to the comparables to bring them in line with North Country Commons, but this criticism is striking in light of the fact that OSJ's appraiser did not make adjustments to the value of the comparables that he used based on the vacancy of the properties used.  While Peatfield's ultimate conclusion may be consistent with his income capitalization approach, the fact that he did not make adjustments to the value of the comparables that he used, despite the fact that they had a greater vacancy rate, and only made, at most, a 15% adjustment based on the size of the properties despite the fact that they

were substantially smaller than the subject Property calls into question the accuracy of his appraisal.  As a result, the Court will adopt the comparables utilized by Ryan.

### D.  Tax Assessment

Both Ryan and Peatfield note that the tax assessment of North Country Commons is approximately $6.3 million at $28.67 per square feet. (Ex. 1 at 34; Ex. 3 at 12).  Ryan's Appraisal shows that he looked at three comparable shopping centers in the area to see what their tax assessment was.  He notes that the three properties are either superior in occupancy or superior in location, and the tax assessment per square feet range from $31.44 to $58.68. (Ex. 1 at 35).  Thus, he concludes that the current tax assessment is appropriate in light of the current condition and occupancy of the Debtor.

Peatfield's Appraisal just states that in his opinion the Property has been "substantially over-assessed," and that he modified the cash flow of the Property to reflect the over-assessed value, which was done by including a tax rate in adjusting the value under the income capitalization approach. (Ex. 3 at 12; Tr. 1/22 at 53).  However, Peatfield did not include or document in his Appraisal the steps that he took or the information that he relied on in reaching his conclusion that the Property was over-assessed.  He testified that he looked at comparable shopping centers within Clifton Park, but in the absence of any documentary evidence there is nothing for the Court to review besides his assertion at the hearing. (Tr. 1/22 at 117).  Had Peatfield provided the Court with more information to support his opinion, then the Court might have been more persuaded by his conclusion.  However, by itself a mere conclusion is not enough.  This negatively impacts the Court's view of his appraisal as to the "as is" value of the Property as Peatfield made adjustments in his calculations to the potential present value of the Property due to his opinion the property was over-assessed.

Thus, the Court finds that the tax assessment, while not determinative of the value of North Country Commons, supports Ryan's conclusion.

## Conclusion

After due consideration of the appraisals submitted by both sides and the testimony provided at the hearings, and in accordance with the above findings of fact, the Court finds that North Country Commons has a $5.5 million "as is" value.  Contrary to OSJ's appraisal, the Property is not to be valued at less than the price the Debtor paid for it in 2004.  The Court has not been persuaded by the evidence presented by OSJ to further devalue the Property below even that which OSJ paid for the Loan Documents in 2007.  Furthermore, for purposes of determining whether OSJ's claim in this bankruptcy estate is oversecured or undersecured, this Memorandum Decision will apply, and OSJ's claim is oversecured.

In addition, several matters in this bankruptcy case were stayed due to the evidentiary hearing that was the subject of the instant memorandum decision.  These matters will now be heard before this Court at 10:00 a.m. on July 30, 2009.

Dated: Central Islip, New York
       July 6, 2009

                                        _s/ Dorothy Eisenberg_____
                                        Judge Dorothy Eisenberg
                                        United States Bankruptcy Judge